IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

**GUIDEONE ELITE INSURANCE
COMPANY**, *et al.*                                    **PLAINTIFFS**

**V.**                          **CIVIL ACTION NO. 2:13-CV-134-KS-MTP**

**MOUNT CARMEL MINISTRIES**, *et al.*                    **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

For the reasons provided below, the Court awards Counter-Claimants Mt. Carmel Ministries, Alpha Christian School, and Seaway Bank and Trust Company $1,693,035.31 in benefits under the insurance policy issued by Counter-Defendant GuideOne Elite Insurance Company.

## I. BACKGROUND

The Court provided the factual background of this case in a previous opinion. *GuideOne Elite Ins. Co. v. Mt. Carmel Ministries*, No. 2:13-CV-134-KS-MTP, 2015 U.S. Dist. LEXIS 912, at *2-*4 (S.D. Miss. Jan. 6, 2015). On April 7-10, 2015, the Court held a bench trial. At the close of the trial, the Court granted GuideOne's motion for judgment as a matter of law as to Mt. Carmel and Seaway's claims for punitive and extra-contractual damages. The Court later set a briefing schedule [183] for the only remaining issue in the case: the amount of contractual damages due under the policy for the tornado damage to the subject buildings. After consideration of the parties' briefs and the evidence presented at trial, the Court finds as follows.

## II. FINDINGS OF FACT

**A.    *Stipulated Facts*[1]**

1.    GuideOne issued a commercial property insurance policy to Mount Carmel Ministries and Alpha Christian School ("Mount Carmel"). The Policy's effective dates were July 7, 2012, to July 8, 2013.

2.    On January 29, 2013, Mt. Carmel requested reinstatement of the Policy.

3.    A tornado struck Mt. Carmel on February 10, 2013.

4.    On February 18, 2013, GuideOne denied reinstatement of the Policy with knowledge that Mt. Carmel's property had been severely damaged in the tornado.

5.    The Court previously found as a matter of law that GuideOne's notice of cancellation was ineffective, its cancellation was ineffective, its Policy was in effect on the date of loss, and that GuideOne breached the insurance contract with Seaway.

6.    The tornado was a covered peril under the Policy.

7.    After the tornado, Seaway, as mortgagee of the insured premises, and Mt. Carmel, as insured, submitted claims under the Policy.

8.    GuideOne denied Mt. Carmel's and Seaway's claims under the Policy.

9.    To date, GuideOne has tendered no payment to Seaway or Mt. Carmel on their claims.

**B.    *Court's Findings of Fact*[2]**

1.    The estimate provided by Seaway's expert, Douglas McColl, was based on an inspection that occurred approximately sixteen to seventeen months after the tornado – a year or more after Mt. Carmel's mitigation efforts had ceased. Therefore, McColl's

---

[1]These facts were stipulated in the Pretrial Order [176].

[2]In this section, the Court provided only its broad, primary findings of fact. Additional findings of fact may be found throughout the opinion.

estimate included damages caused by factors subsequent to the tornado, such as water intrusion, exposure to the elements, and humidity.

2.   The estimate provided by Mt. Carmel's expert, David Landry, was based on an inspection that occurred approximately eleven months after the tornado – months after Mt. Carmel's mitigation efforts had ceased. Therefore, Landry's estimate included damages caused by factors subsequent to the tornado, such as water intrusion, exposure to the elements, and humidity.

3.   The estimate provided by GuideOne's expert, Tom Stockdale, was based on an inspection that occurred less than two months after the tornado, while GuideOne's mitigation efforts were still effective. Therefore, of the options presented to the Court, Stockdale's estimate provides the clearest picture of the damages directly caused by the tornado.

4.   The amount it would cost to repair or replace the direct physical loss of or damage to Mt. Carmel's Buildings A, B, and C caused by the tornado, with material of like kind and quality, subject to a deduction for deterioration, depreciation or obsolescence, is $1,693,035.31.

5.   The market value of Mt. Carmel's Buildings A, B, and C is $2,450,000.00.

6.   The "actual cash value" of Mt. Carmel's Buildings A, B, and C, as defined by the Policy, is $1,693,035.31.

7.   Mt. Carmel failed to mitigate its damages insofar as it prematurely ceased mitigation efforts such as maintaining tarps on the roofs and treating mold and mildew growth.

8.   Mt. Carmel's failure to sustain mitigation efforts caused the buildings to incur more damage than they would have otherwise.

9.   At a minimum, it was feasible for Mt. Carmel to maintain tarps on the roofs and continue to treat mold and mildew with bleach.

### III. CONCLUSIONS OF LAW

**A.   *Consequential Damages***

3

Citing general principles of contract law, Mt. Carmel argues that it should recover consequential damages – all reasonably foreseeable damages caused by GuideOne's failure to perform its contractual duties. Mississippi law is quite clear on this issue: "[I]nsurers who are not liable for punitive damages may nonetheless be liable for consequential or extra-contractual damages (e.g., reasonable attorney fees, court costs, and other economic losses) where their decision to deny the insured's claim is without a reasonably arguable basis but does not otherwise rise to the level of an independent tort." *Broussard v. State Farm Fire & Cas. Co.*, 523 F.3d 618, 628 (5th Cir. 2008) (citing *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1186 n. 13 (Miss. 1990)).[3]

In two previous opinions [150, ] this Court held that GuideOne had a reasonably arguable basis for denying coverage. *GuideOne*, 2015 U.S. Dist. LEXIS 912 at *15-*16; *GuideOne Elite Ins. Co. v. Mt. Carmel Ministries*, No. 2:15-CV-134-KS-MTP, 2015 U.S. Dist. LEXIS 42681, at *5 (S.D. Miss. Apr. 1, 2015). At trial, the Court granted GuideOne's motion for judgment as a matter of law as to Mt. Carmel's claims for extra-contractual damages. The law of the case, therefore, is that Mt. Carmel is only entitled to the benefits owed under the policy – specifically, the "direct physical loss of or damage to" the subject buildings caused by the tornado.

---

[3]*See also Essinger v. Liberty Mut. Fire Ins. Co.*, 529 F.3d 264, 270-71 (5th Cir. 2008); *Mitchell v. State Farm Fire & Cas. Co.*, 799 F. Supp. 2d 680, 696 (N.D. Miss. 2011); *Peoples Bank of the S. v. Bancinsure, Inc.*, 753 F. Supp. 2d 649, 657-60 (S.D. Miss. 2010); *USAA v. Lisanby*, 47 So. 3d 1172, 1178-79 (Miss. 2010); *Univ. Life Ins. Co. v. Veasley*, 610 So. 2d 290, 295 (Miss. 1992); Jeffrey Jackson, <u>Miss. Ins. Law & Practice</u>, § 13:21 (2015).

**B.**     *Contractual Damages*

    *1.*     *General Principles of Policy Interpretation*

The Court's ultimate goal in applying an insurance policy is to "render a fair reading and interpretation of the policy by examining its express language and applying the ordinary and popular meaning to any undefined terms." *Corban v. United Servs. Auto. Ass'n*, 20 So. 3d 601, 609 (Miss. 2009). "In Mississippi, insurance policies are contracts, and as such, they are to be enforced according to their provisions." *Id.*

> First, where an insurance policy is plain and unambiguous, a court must construe that instrument, like other contracts, exactly as written. Second, it reads the policy as a whole, thereby giving effect to all provisions. Third, it must read an insurance policy more strongly against the party drafting the policy and most favorably to the policy holder. Fourth, where it deems the terms of an insurance policy ambiguous or doubtful, it must interpret them most favorably to the insured and against the insurer. Fifth, when an insurance policy is subject to two equally reasonable interpretations, a court must adopt the one giving the greater indemnity to the insured. Sixth, where it discerns no practical difficulty in making the language of an insurance policy free from doubt, it must read any doubtful provision against the insurer. Seventh, it must interpret terms of insurance policies, particularly exclusion clauses, favorably to the insured wherever reasonably possible. Finally, although ambiguities of an insurance policy are construed against the insurer, a court must refrain from altering or changing a policy where terms are unambiguous, despite resulting hardship on the insured.

*Nationwide Mut. Ins. Co. v. Lake Caroline, Inc.*, 515 F.3d 414, 419 (5th Cir. 2008); *see also Corban*, 20 So. 3d at 609; *Guidant Mut. Ins. Co. v. Indem. Ins. Co. of N. Am.*, 13 So. 3d 1270, 1281 (Miss. 2009); *United States Fid. & Guar. Co. v. Martin*, 998 So. 2d 956, 963 (Miss. 2008).

    *2.*     *Payment and Valuation Under the Policy*

The policy[4] provides:

## A.    Coverage

> We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.[5]

It is undisputed that a tornado is a "Covered Cause of Loss," and that Buildings A, B, and C are "Covered Properties," described in the Declarations as "Risk No. 001" (A) and "Risk No. 002" (B, C).[6] It is likewise undisputed that Buildings A, B, and C suffered a "direct physical loss" caused by the tornado. Therefore, GuideOne is obligated to pay for the direct physical damage to Buildings A, B, and C caused by the tornado.

Next, the policy explains how the loss is paid:

## 4.    Loss Payment

> **a.**    In the event of loss or damage covered by this Coverage Form, at our option, we will either:
>
> > **(1)**    Pay the value of lost or damaged property;
> >
> > **(2)**    Pay the cost of repairing or replacing the lost or damaged property . . . ;
> >
> > **(3)**    Take all or any part of the property at an agreed or appraised value; or
> >
> > **(4)**    Repair, rebuild or replace the property with other property of like kind and quality . . . ;

---

[4]The policy was introduced at trial as Exhibit SD-2. The Court will cite to it as the "Policy" where necessary.

[5]Policy, at 33.

[6]*Id.* at 16.

> We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.[7]

Therefore, GuideOne agreed to pay for a loss according to one of these four methods, at their option.

The policy's "Valuation Condition" provides the method to determine the replacement cost or value of damaged property:

**7.   Valuation**

> We will determine the value of Covered Property in the event of loss or damage as follows:

> **a.**   At replacement cost (without deduction for depreciation) . . . .[8]

However, according to the Declarations,[9] the policy included the "Actual Cash Value" endorsement, which is described in the "Optional Coverages" section:

**3.   Actual Cash Value**

> Valuation of Covered Property will be determined at "actual cash value" regardless of whether that property has sustained partial or total loss or damage. The "actual cash value" of the lost or damaged property may be significantly less than its replacement cost.

> When this optional coverage applies and a form, which is applicable to this Coverage Part and is subject to the provisions of

---

[7] *Id.* at 53.

[8] *Id.* at 55.

[9] *Id.* at 16.

7

this Coverage Form, indicates it modifies subparagraphs **a.** and **b.**, or the Actual Cash Value part, of the Valuation condition, such form shall be construed as modifying this optional coverage.

    **a.**    "Actual cash value" replaces replacement cost provisions **a.**, **b.**, **c.**, **d.**, **e.** and **f.** in the Loss Condition, Valuation, of this Coverage Form.[10]

Accordingly, the "Actual Cash Value" endorsement[11] replaces the policy's general replacement cost valuation method,[12] and the value of all damage or loss to covered property is determined by an "actual cash value" method.

The policy provides the following definition of "actual cash value":

    **1.**    **"Actual Cash Value"** means loss or damage calculated as the lesser of:

        **a.**    The amount it would cost to repair or replace covered property with material of like kind and quality, subject to a deduction for deterioration, depreciation or obsolescence, however caused; or

        **b.**    The market value of covered property, based upon recent sales of comparable property, if available.[13]

Therefore, according to the policy, GuideOne is obligated to pay "direct physical loss of or damage to" Buildings A, B, and C caused by the tornado.[14] The value of the loss is the lesser of 1) the "amount it would cost to repair or replace" Buildings A, B, and

---

[10]*Id.* at 58-59.

[11]*Id.*

[12]*Id.* at 55.

[13]*Id.* at 59.

[14]*Id.* at 33.

C "with material of like kind and quality, subject to a deduction for deterioration, depreciation or obsolescence;" or 2) the "market value" of Buildings A, B, and C, "based upon recent sales of comparable property . . . ."

### 3.   GuideOne's Option Under the Loss Payment Provision

Seaway argues that GuideOne elected the "replacement cost" option under the "Loss Payment" condition – paying "the cost of repairing or replacing the lost or damaged property . . . ." Seaway contends that this option is a direct reference to the second definition of "actual cash value" – "the cost to repair or replace covered property with material of like kind and quality, subject to a deduction for deterioration, depreciation or obsolescence" – and that GuideOne elected to use the second definition of "actual cash value."

However, while the policy grants GuideOne such an option in the "Loss Payment" section,[15] it does not provide an option in the definition of "actual cash value"[16] which supplanted the "replacement cost" provisions of the "Valuation" condition.[17] As outlined above, according to the "Loss Payment" condition, "replacement cost" is defined by the "Valuation" condition.[18] The "Actual Cash Value" endorsement replaced the "Valuation" condition's "replacement cost" provisions with its definition

---

[15]*Id.* at 53.

[16]*Id.* at 59.

[17]*Id.* at 55.

[18]*Id.* at 53.

9

of "actual cash value."[19] "Actual cash value" is defined as the lesser of the "cost to repair or replace covered property with material of like kind and quality, subject to a deduction for deterioration, depreciation or obsolescence . . ." or "market value."[20] Therefore, even if GuideOne elected to pay "replacement cost" as provided under the "Loss Payment" condition, they are only obligated to pay the lesser of 1) the "amount it would cost to repair or replace" Buildings A, B, and C "with material of like kind and quality, subject to a deduction for deterioration, depreciation or obsolescence;" or 2) the "market value" of Buildings A, B, and C, "based upon recent sales of comparable property . . . ."

Even if GuideOne's adjusters represented to Mt. Carmel that it would value and pay the claim according to a certain method, under Mississippi law, an insured may not reasonably rely on representations made by an insurer's agent that are contrary to the terms of the policy. *See Leonard v. Nationwide Mut. Ins. Co.*, 499 F.3d 419, 438 (5th Cir. 2007); *Ross v. Citifinancial, Inc.*, 344 F.3d 458, 464 (5th Cir. 2003). Oral representations can only modify a policy if it is ambiguous. *Leonard*, 499 F.3d at 438 (citing *Am. States Ins. Co. v. Natchez Steam Laundry*, 131 F.3d 551, 555 (5th Cir. 1998)). As outlined above, the policy is not ambiguous.

To the extent Seaway and Mt. Carmel argue that GuideOne is equitably estopped from paying "market value" based on its adjusters' representations, "doctrines

---

[19] *Id.* at 58-59.

[20] *Id.* at 59.

like equitable estoppel that allow insureds to procure rights at variance with a written insurance policy can not be used to extend coverage not otherwise provided by the policy." *Id.* at 441 (citing *Kubow v. Hartford Cas. Ins. Co.*, 475 F.3d 672 (5th cir. 2007); *St. Paul Fire & Marine Ins. Co. v. Vest Transp. Co.*, 666 F.2d 932, 948 (5th Cir. 1982); *Morris v. Am. Fidelity Fire Ins. Co.*, 173 So. 2d 618 (Miss. 1965)). Even if equitable estoppel could extend coverage not provided by the policy, it would not be applicable here as an insured can not reasonably rely on oral representations contrary to the terms of the policy. *Id.* at 438.

Finally, GuideOne's representatives' interpretations of the policy – whether provided while they adjusted Mt. Carmel's claim, during their depositions, or at trial – are irrelevant to the Court's decision. "The interpretation of an insurance policy is a question of law, not one of fact." *Minn. Life Ins. Co. v. Columbia Cas. Co.*, 164 So. 3d 954, 967-68 (Miss. 2014); *see also Epperson v. SOUTHBank*, 93 So. 3d 10, 17 (Miss. 2012). No amount of testimony by any witness will alter the policy's terms, which the Court must enforce as written. *Epperson*, 93 So. 3d at 17.

### 4.   *The Agreed Value Endorsement*

The policy includes an "Agreed Value" endorsement,[21] which provides:

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

Unless otherwise indicated on the Declarations, Agreed Value is an Optional Coverage, and not included on this policy.

---

[21]Policy, at 77.

11

The declarations[22] indicate that the policy includes the Agreed Value endorsement. The "Optional Coverages" section[23] provides the endorsement's terms:

1. **Agreed Value**

     a.   The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

Therefore, the "Agreed Value" endorsement eliminates the policy's coinsurance penalty, which is not relevant to this case, and it has no bearing on the valuation of Mt. Carmel's loss or the amount owed under the policy.

Seaway and Mt. Carmel apparently argue that the "Agreed Value" endorsement constitutes an agreement that the policy limits are the "actual cash value" or "market value" of the buildings. However, that is not what the "Agreed Value" endorsement provides, and neither Seaway nor Mt. Carmel have cited any provision of the policy to support their position. To the extent they base this argument on the testimony and representations of GuideOne's representatives, the Court again notes that an insured may not reasonably rely on representations made by an insurer's agent that are contrary to the terms of the policy. *See Leonard*, 499 F.3d at 438; *Ross*, 344 F.3d at 464. Oral representations can only modify a policy if it is ambiguous, *Leonard*, 499 F.3d at

---

   [22]*Id.* at 16.

   [23]*Id.* at 58.

438, and the "Agreed Value" endorsement[24] is not ambiguous.

Furthermore, as noted above, "[t]he interpretation of an insurance policy is a question of law, not one of fact." *Minn. Life Ins. Co.*, 164 So. 3d at 967-68; *see also Epperson*, 93 So. 3d at 17. Therefore, any witness's interpretation of the "Agreed Value" endorsement is irrelevant to the Court's analysis. No amount of testimony or other evidence will alter the policy's terms, which the Court must enforce as written. *Epperson*, 93 So. 3d at 17.

    5.    *Miss. Code Ann. § 83-13-5*

Mt. Carmel and Seaway argue that Miss. Code Ann. § 83-13-5 applies to this case. That statute provides, in relevant part:

> No insurance company shall knowingly issue any fire insurance policy upon property within this state for an amount which, together with any existing insurance thereon, exceeds a fair value of the property . . . . When buildings and structures are insured against loss by fire and, situated within this state, are totally destroyed by fire, the company shall not be permitted to deny that the buildings or structures insured were worth at the time of the policy the full value upon which the insurance is calculated, and the measure of damages shall be the amount for which the buildings and structures were insured.

MISS. CODE ANN. § 83-13-5. Mt. Carmel and Seaway argue that Mississippi law prevents GuideOne from arguing that the "actual cash value" of the buildings is less than the "agreed value" stated in the policy.

By its plain terms, this statute only applies to losses where the building is "totally destroyed by fire." *Id.*; *see also Remel v. State Farm Fire & Cas. Co.*, No. 1:07-

---

[24]Policy, at 58.

CV-126-LTS-RHW, 2009 U.S. Dist. LEXIS 15616, at *9 (S.D. Miss. Feb. 25, 2009); *Lamb v. Liberty Mut. Ins. Co.*, No. 1:06-CV-976-HSO-JMR, 2008 WL 625021, at *3 (S.D. Miss. Feb. 29, 2008); Jackson, *supra* note 3, § 15:11. The subject buildings were not "totally destroyed by fire." Therefore, Miss. Code Ann. § 83-13-5 is inapplicable.

6.    *Cost to Repair or Replace*

As provided above, Mt. Carmel is obligated to pay for "direct physical loss of or damage to" Buildings A, B, and C caused by the tornado,[25] and the value of the loss is the lesser of 1) the "amount it would cost to repair or replace" Buildings A, B, and C "with material of like kind and quality, subject to a deduction for deterioration, depreciation or obsolescence;" or 2) the "market value" of Buildings A, B, and C, "based upon recent sales of comparable property . . . ." The Court will first address the cost to repair or replace the buildings. Each party presented testimony from its own expert.

**a.    Douglas McColl**

First, the Court heard testimony from Douglas McColl, Seaway's expert in the field of property damage assessment. McColl and his team inspected the properties on June 23-25, and July 9-10, 2014. He produced a detailed 650-page report on the damage to Buildings A, B, and C.[26] McColl used Xactimate, a software widely used in the insurance industry to estimate the value of damaged/destroyed property which uses a cost database according to ZIP code and time frame. He also obtained a

---

[25]*Id.* at 33.

[26]McColl's report was admitted as Exhibit SD-33.

14

measurement of the buildings' roofs via satellite imagery.

McColl provided the following summary valuation[27] of Mt. Carmel's damages:

| Building A | |
|---|---|
| Roof | $583,052.74 |
| Exterior | $20,912.80 |
| Interior | $819,827.12 |
| General Conditions | $172,579.93 |
| **Building A Subtotal** | **$1,596,372.59** |
| **Buildings B & C** | |
| Roof | $514,368.19 |
| Exterior | $103,064.79 |
| Interior, 1st Floor B | $1,506,722.08 |
| Interior, 2nd Floor B | $1,054,033.63 |
| Interior, 1st Floor C | $929,750.62 |
| Interior, 2nd Floor C | $1,182,280.98 |
| General Conditions | $641,237.88 |
| **Buildings B & C Subtotal** | **$5,931,458.17** |
| **Total** | **$7,527,830.76** |

These figures have been depreciated based on the particular building material under

consideration, condition, age, and McColl's own visual inspection and experience.[28] The

----

[27]At the end of each subsection of the estimate – i.e. Building A, Building B, Building C, Roofs – McColl provided a summary and subtotal. Each subsection's summary is highly detailed, and it is not necessary to reproduce them here.

[28]Before he added General Conditions, McColl subtracted $933,847.32 of depreciation from $7,656,295.87 in total replacement costs – an effective depreciation rate of 12.2%.

"general conditions" category includes overhead costs for the construction project, such as a generator at the site, portable toilets, dumpsters, security guards, and fencing. It also included the general contractor's overhead and profit, sales tax, engineering and architect fees, and insurance.

The problem with McColl's estimate is that it is based on an inspection that occurred on June 23-25, and July 9-10, 2014 – sixteen to seventeen months after the tornado of February 10, 2013. McColl admitted that his estimate included damage that occurred both during and after the tornado, and that he could not delineate between damage directly caused by the tornado and damage caused by other factors during the subsequent months. During a series of questions from the Court, McColl confirmed that certain damage in the basement of Building B was caused by water intrusion after the tornado. He also testified that it was raining during his inspections of the property, and that he observed water entering the buildings while he inspected them. He admitted that he did not review any photographs of the buildings taken closer to the tornado's occurrence.

Overall, McColl was a thorough and credible witness, and he provided an intricately detailed estimate of damages. The Court has no reason to doubt his knowledge and experience. McColl's estimate would be quite useful to the Court if it were determining the cost to repair or replace Mt. Carmel's property damaged by the tornado *and* months of water intrusion, exposure to the elements, and humidity. But, as noted above, GuideOne is only obligated to pay for the "direct physical loss of or

damage to" Buildings A, B, and C caused by the tornado[29] – not the indirect consequential damages that occurred months after the event. Therefore, while McColl's estimate may contain information relevant to the valuation of Mt. Carmel's damages, the Court is not able to separate it from the irrelevant information. If the expert himself could not delineate between damage directly caused by the tornado and damage caused by subsequent factors, the Court can not do so. Any such attempt would be an arbitrary guess, lacking factual support.

### b.   David Landry

The Court also heard testimony from David Landry, Mt. Carmel's expert in architecture and the preparation of building repair estimates. Landry visited the site on January 16, 2014, and July 29, 2014. During his first visit, he viewed 95-99% of the rooms in Buildings A, B, and C, took photographs, measured the rooms, and identified the repair work that needed to be done. During the second visit, he confirmed the findings from his initial visit, and he later produced a report and estimate.[30]

Landry described his estimate as a "preliminary type cost estimate" that would be provided to a property owner prior to receiving a final bid from a general contractor. He calculated a subtotal of hard construction costs and added a variety of "soft costs," which he claimed were calculated by applying a percentage to the non-depreciated hard construction costs. He testified that he based his estimates on his own knowledge and

---

[29]Policy at 33.

[30]Landry's report was admitted as Exhibit MC-D-37.

experience, consultations with third-party vendors, and actual prices in this geographical area. He then added the soft costs to the depreciated hard construction costs to reach a grand total. His findings are summarized as follows:

| Building A | |
| --- | --- |
| 1st Floor General Repairs | $148,710.48 |
| 1st Floor Mold Cleaning | $5,000.00 |
| 1st Floor Electrical | $10,000.00 |
| 2nd Floor General Repairs | $50,542.12 |
| 2nd Floor Mold Cleaning | $5,000.00 |
| 2nd Floor Electrical | $10,000.00 |
| **Building A Subtotal** | **$229,252.61** |
| **Building B**[31] | |
| 1st Floor Demo & New Construction | $3,685,968.00 |
| 2nd Floor Demo & New Construction | $2,646,800.00 |
| **Building B Subtotal** | **$6,332,768.00** |
| **Building C** | |
| Basement General Repairs | $78,462.22 |
| Basement Mold Cleaning | $3,000.00 |
| Basement A/C Units | $16,428.57 |
| Basement Electrical | $5,000.00 |
| 1st Floor General Repairs | $265,783.77 |
| 1st Floor Mold Cleaning | $5,000.00 |
| 1st Floor A/C Units | $49,285.71 |

---

[31]Landry does not believe that Building B can be repaired, and he provided an estimate for new construction.

18

| 1st Floor Electrical | $10,000.00 |
|---|---|
| 2nd Floor General Repairs | $297,812.88 |
| 2nd Floor Mold Cleaning | $5,000.00 |
| 2nd Floor A/C Units | $49,285.71 |
| 2nd Floor Electrical | $10,000.00 |
| **Building C Subtotal** | **$795,058.88** |
| **Roofing** | |
| Building A | $446.757.07 |
| Building C | $222,475.69 |
| **Roofing Subtotal** | **$669,232.76** |
| **Hard Costs Subtotal** | **$8,026,312.24** |
| **Depreciated Hard Costs Subtotal**[32] | **$6,531,382.43** |
| **Soft Costs** | |
| General Conditions[33] | $280,920.93 |
| Insurance[34] | $34,890.38 |
| Performance Bond[35] | $62,565.92 |

---

[32]Landry applied a 50% depreciation rate to the roofing costs, and a 15% depreciation rate to all other hard construction costs. He admitted, however, that his depreciation factors were "purely speculative," and he conceded that calculating depreciation was outside his area of expertise.

[33]Landry calculated general conditions as 3.5% of the non-depreciated hard construction costs.

[34]Landry apparently calculated the cost of insurance as 0.42% of the sum of the non-depreciated hard construction costs and general conditions.

[35]Landry apparently calculated the cost of a performance bond as 0.75% of the sum of the non-depreciated hard construction costs, general conditions, and insurance.

| | |
|---|---|
| Profit[36] | $420,234.47 |
| Tax[37] | $330,542.17 |
| Architect/Engineer Fee[38] | $640,882.62 |
| Asbestos & Mold Testing | $20,000.00 |
| Soil Borings | $5,000.00 |
| **Grand Total** | **$8,326,418.92**[39] |

While Landry's summary is lengthier, his actual report is substantially less detailed and precise than McColl's. As demonstrated by the Court's footnotes above, Landry's report and testimony provided little clarity as to how and/or why he calculated certain costs in the manner he chose. For example, to calculate $330,542.17 in sales tax, he had to have applied the 3.63% tax rate to a subtotal of $9,105,844.90,[40] but neither his report nor testimony explain where that subtotal came from. He also

---

[36]Landry apparently calculated the general contractor's profit as 5% of the sum of the non-depreciated hard construction costs, general conditions, insurance, and performance bond.

[37]The Court has studied Landry's testimony and report, and can not determine how he reached a figure of $330,542.17 in sales tax. He testified that construction sales were taxed at rate of 3.63%. That would require him to have applied sales tax to a total of $9,105,844.90 – ($330,542.17 / 0.0363 = $9,105,844.90) – and that figure does not appear anywhere in his summary or testimony.

[38]Landry apparently calculated the architect/engineer fee as 7% of the sum of the non-depreciated hard construction costs, general conditions, insurance, performance bond, profit, and sales tax.

[39]Landry provided a grand total of $8,345,017.65. The Court has studied his testimony and report, and can not determine how he reached that figure. The number provided by the Court – $8,326,418.92 – is the sum of the soft costs as calculated by Landry and the depreciated hard costs.

[40]$330,542.17 / 0.0363 = $9,105,844.90

testified that the soft costs were calculated by applying a percentage to the non-depreciated hard construction costs, but he appears to have calculated each soft cost as a percentage of the non-depreciated hard costs plus each preceding soft cost listed in his report.

Landry's opinion also suffers from the same problem as McColl's: he inspected the buildings months after the tornado. The tornado occurred on February 10, 2013. Landry inspected the buildings on January 16, 2014 – eleven months after the tornado – and July 29, 2014 – over seventeen months after the tornado. It appears that his estimate was based primarily on what he viewed during the January 16, 2014, inspection. Landry admitted at trial that he did not attempt to calculate the cost of repairs before the months of water intrusion and exposure following the tornado. He stated he "had no idea of the condition of the building prior to that." As noted above, GuideOne is only obligated to pay for the "direct physical loss of or damage to" Buildings A, B, and C caused by the tornado[41] – not the indirect consequential damages following it. Like McColl, Landry provided the Court with no factual basis to delineate between the damage directly caused by the tornado and the consequential damage occurring later.

### c.    Tom Stockdale

Finally, the Court heard testimony from Tom Stockdale, GuideOne's expert in construction engineering, construction estimating, and construction project

---

[41]Policy at 33.

management. Stockdale works for GC3, formerly GuideOne Taylor Ball, a subsidiary of GuideOne. He sent a team of five people to Hattiesburg from March 29, 2013, through April 5, 2013, because he believed that one or two people could not effectively scope the buildings. The team took approximately 2,102 photographs. They directly observed every room in Buildings A, B, and C, and generated a scope of loss. Rick Trower, a member of the on-site team and estimator under Stockdale's supervision, used Xactimate to prepare an estimate based on the scope of loss. Stockdale's report[42] contains a letter providing his opinions, a summary of the damage estimate, the scope of loss, and the estimate. Stockdale did not visit the site, prepare the scope of loss, or prepare the estimate, but he personally reviewed all 2,102 photographs and the scope of loss, and evaluated and approved the estimate prepared by Trower.

Stockdale's report provided the following summary valuation of Mt. Carmel's damages:

| Building | Estimated Cost of Repair |
|---|---|
| A (Sanctuary) | $278,352 |
| B & C (Education) | $1,691,589 |
| **Non-Depreciated Sub-Total** | **$1,968,941** |
| Building A Depreciation | ($25,900.73)[43] |
| Buildings B & C Depreciation | (283,306.01) |

---

[42]Stockdale's report was admitted as Exhibit P-17.

[43]Stockdale testified that he used Xactimate to calculate depreciation by entering in the age of building materials. The program applied depreciation rates of approximately 9.3% to Building A, and approximately 16.75% to Buildings B and C.

| Actual Cash Value | $1,660,535.31 |
|---|---|

Stockdale testified that these figures included 3% overhead and 10% profit. He also testified that they were not based on the cheapest possible repairs, but that Xactimate uses median prices. Although Stockdale's summary was brief, his full estimate was as thorough and detailed as McColl's.

When directly asked why GC3's estimate was so much lower than McColl's and Landry's, Stockdale testified:

> The main conclusion that I arrived at was that they were different because the scopes that we were estimating varied substantially. The amount of damage that they had recorded was substantially different than the amount of damage that we recorded. Our . . . scoping was done less than two months after the tornado. The scoping that they did, Mr. Landry I believe scoped it eleven months after the tornado, and [McColl] did their scoping after more than sixteen months after the tornado event.

This testimony is consistent with Stockdale's report, in which he stated that the "disparity in time of observation plays a major role in explaining the difference in the valuations of the damages." He continued: "GC3, LLC's estimates reflect the value of the damages caused by the tornado whereas the other two firms' estimates reflect the damages caused by the tornado in conjunction with more than a year of deterioration."[44] Stockdale admitted, however, that GC3's estimate was not final

---

[44]Stockdale also noted several other differences between his estimate and McColl's. McColl included a contingency amount of $177,000 for "unknown" costs, while Stockdale only included known costs. Stockdale also testified that McColl's report includes some redundancies in certain "General Conditions" sub-sections. McColl used a 10% markup for overhead, while Stockdale only used a 3% markup. Finally, Stockdale only included $5,000 in architect fees, while Landry calculated the architect fee at 7%.

because it had not consulted a structural engineer and obtained a structural analysis of the buildings. He also admitted that GC3's estimate did not include asbestos, lead paint, or mold testing and remediation, but that a final estimate would include those items.

### d.    Conclusions

As the Court has noted, the law of the case is that Mt. Carmel is not entitled to extra-contractual or consequential damages, and GuideOne is only obligated to pay for the "direct physical loss of or damage to" Buildings A, B, and C caused by the tornado.[45] Stockdale's opinion and GC3's estimate provides the most relevant evidence on that issue. McColl's estimate was based on an inspection sixteen to seventeen months after the tornado, and Landry's was based on an inspection eleven months after the tornado. McColl testified that the tarps initially placed on the buildings would have only provided protection for three to four months. Therefore, both McColl's and Landry's estimates included months of damage caused by water intrusion and exposure, while GC3's estimate is based on an inspection that occurred while the buildings were still protected by Mt. Carmel's mitigation efforts. In the Court's opinion, this is the most significant factor in weighing the experts' opinions. Accordingly, the Court elects to accept GC3's estimate, subject to the modifications provided below.

Mt. Carmel and Seaway argue that the Court should not credit Stockdale's testimony because he did not personally view the damage. However, experts routinely

---

[45]Policy at 33.

base their opinions on information from third-party sources or reports from their own employees. A team from GC3 viewed the property and contributed to the scope of loss, and a member of that team, Rick Trower, prepared the estimate under Stockdale's supervision. Therefore, the GC3 estimate is, in fact, based on personal observation.

Mt. Carmel and Seaway also argue that Stockdale's testimony is inherently suspect because GC3 is a subsidiary of GuideOne. However, if the Court discredited every expert witness with a potential interest in his client's success at trial, it would never believe the testimony of any expert witness. Even a third party expert has a pecuniary interest in his client's success, insofar as he presumably desires repeat business. Regardless, neither Mt. Carmel nor Seaway presented any evidence that GC3's status as a subsidiary of GuideOne had any effect on its deliberative process or conclusions.

GC3's estimate did not include items which Stockdale admitted should be included in a final estimate. Stockdale testified that GC3's estimate did not include a structural engineering fees or the cost of asbestos and mold testing. As Stockdale admitted that these items would be included in a final estimate, the Court will supplement GC3's estimate with the appropriate figures as provided in McColl's or Landry's reports.

As for depreciation, no party has convinced the Court that their expert's depreciation method was more appropriate or accurate than the others. Landry applied a 50% depreciation rate to the roofs and a 15% depreciation rate to all other hard construction costs, but he admitted that determining an appropriate depreciation rate

was outside his area of expertise. McColl applied varying depreciation rates depending on the particular building material under consideration, its condition, age, and his own visual inspection and experience. As noted above, he effectively applied a 12.2% depreciation rate. Stockdale used Xactimate to calculate the depreciation rate, and the program applied depreciation rates of approximately 9.3% to Building A, and approximately 16.75% to Buildings B and C. At least two of the experts trust Xactimate enough to use it in preparing their estimates, and it is undisputed that the program is widely used in the insurance industry. Accordingly, the Court will accept the depreciation rates provided by Xactimate and used by Stockdale.

Therefore, the Court finds that the "amount it would cost to repair or replace"[46] the "direct physical loss of or damage to" Mt. Carmel's Buildings A, B, and C caused by the tornado[47] "with material of like kind and quality, subject to a deduction for deterioration, depreciation or obsolescence"[48] is:

| Element of Damages | Cost to Repair/Replace |
|---|---|
| Building A | $278,352.00 |
| Buildings B & C | $1,691,589.00 |
| **Non-Depreciated Sub-Total** | **$1,968,941.00** |
| **Depreciated Sub-Total** | **$1,660,535.31** |

---

[46]*Id.* at 59.

[47]*Id.* at 33.

[48]*Id.* at 59.

| Engineering Fee | $12,500.00[49] |
|---|---|
| Asbestos and Mold Testing | $20,000.00[50] |
| **Grand Total** | **$1,693,035.31** |

7.   *Market Value*

Seaway was the only party who presented evidence of market value. Their expert in real estate appraisal, Martin Winfree, provided an appraisal report.[51] He stated in the report and testified at trial that the market value of Mt. Carmel's Buildings A, B, and C, on February 10, 2013 – as they existed immediately before the tornado – was $2,450,000.00.

Winfree testified that some portions of the buildings were functionally obsolete. He stated in his report that "buildings purchased for use as relatively small places of worship sell regularly," but "large places of worship such as the subject property sell only infrequently. Such properties are rarely placed on the market for sale, and there are only a handful of potential buyers for this type of property." Accordingly, Winfree had to look outside this geographical area to find comparable sales, and considered facilities in Mississippi, Alabama, and Louisiana. These comparable sales indicated

---

[49]The Court supplemented Stockdale's estimate with the Engineering Fee from McColl's estimate.

[50]The Court supplemented Stockdale's estimate with the Asbestos & Mold Testing amount from Landry's estimate. The Policy imposes a $15,000.00 limit on payments for mold remediation, but the Court will assume an additional $5,000.00 is for the asbestos component of this figure.

[51]The report was admitted as Exhibit P-18.

"values for the subject ranging from $13.44 to $37.28 per square foot," and Winfree settled on "a conclusion toward the upper end of the range" – $32.50 per square foot.[52] Winfree's testimony was undisputed and the *only* evidence presented regarding the property's market value. Accordingly, the Court accepts it as true.[53]

8.    *Actual Cash Value*

As provided above, Mt. Carmel's loss is determined on an "actual cash value" basis. The value of the loss is the lesser of 1) the "amount it would cost to repair or replace" Buildings A, B, and C "with material of like kind and quality, subject to a deduction for deterioration, depreciation or obsolescence;" or 2) the "market value" of Buildings A, B, and C, "based upon recent sales of comparable property . . . ."[54] The "amount it would cost to repair or replace" Buildings A, B, and C "with material of like kind and quality, subject to a deduction for deterioration, depreciation or obsolescence" is $1,693,035.31, and the "market value" of Buildings A, B, and C, "based upon recent sales of comparable property" is $2,450,000.00. Accordingly, the actual cash value of Mt. Carmel's loss is $1,693,035.31.

8.    *Debris Removal*

Mt. Carmel argues that the building limits are increased by an additional

---

[52]($32.50 / sq. ft.) (74,741 sq. ft.) = $2,429,083; rounded up to $2,450,000

[53]Mt. Carmel presented several arguments as to why the Court should decline to accept Winfree's testimony or any evidence of market value. Because the market value is greater than the depreciated cost to repair or replace the property, the Court need not address these arguments.

[54]Policy, at 59.

$1,000,000 for debris removal, but it is not clear whether Mt. Carmel contends it is entitled to additional benefits for debris removal. Regardless, the argument is irrelevant because Mt. Carmel settled any claim it might have had for debris removal. During trial, the parties met with the Magistrate Judge and settled all policy claims "except the building damage, structural damage" to Buildings A, B, and C.[55] Mt. Carmel's counsel specifically stated on the record that the claim for "cleanup cost" had been settled, and GuideOne's counsel specifically stated on the record without objection that the claim for "debris removal" had been settled.[56] Therefore, Mt. Carmel already settled its claim for debris removal, and it can not recover additional benefits.

## C.   *Mitigation*

GuideOne argues that Mt. Carmel failed to mitigate its damages. Both the Policy and Mississippi common law required Mt. Carmel to mitigate its damages. First, the Policy provides the following condition:

**3.   Duties In The Event of Loss or Damage**

    **a.**    You must see that the following are done in the event of loss or damage to Covered Property:

* * *

    (4)    Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance.

---

[55]Transcript of Bench Trial Proceedings at 386, ECF No. 197.

[56]*Id.*

29

> However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.[57]

The Policy also includes the following exclusion:

### B.   EXCLUSIONS

* * *

> **2.**   We will not pay for loss or damage caused by or resulting from any of the following:

* * *

> **m.**   Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.[58]

Therefore, the Policy required Mt. Carmel to "take all reasonable steps" to protect the buildings from additional damage after the tornado, and it excluded from coverage all damage caused by Mt. Carmel's failure to do so. Clauses like these are enforceable under Mississippi law. *See, e.g. Glens Falls Ins. Co. v. Linwood Elevator*, 130 So. 2d 262, 271 (Miss. 1961) (submission of mitigation question to jury was not error where policy required insured to use all reasonable means to save and preserve property after a loss).

Mississippi common law imposes similar requirements. In general terms, "one should take steps to mitigate damages." *Papa v. Miss. Farm Bureau Cas. Ins. Co.*, 573

---

[57]Policy, at 53-54.

[58]*Id.* at 65, 67, 69.

So. 2d 761, 763 (Miss. 1990). It is one's duty to "take reasonably proper steps to avoid an accident or injury to . . . property after having knowledge of the danger." *Barkley v. Miller Transporters, Inc.*, 450 So. 2d 416, 420 (Miss. 1984). In the context of a property insurance claim, an insured has "a duty within a reasonable time after [the] original damage to remedy the faulty situation and prevent . . . subsequent damage." *Travelers Indem. Co. v. Rawson*, 222 So. 2d 131, 135 (Miss. 1969). However, "where funds are necessary to meet the situation and the injured person is without the funds, he is excused from the effort." *Adams v. U.S. Homecrafters, Inc.*, 744 So. 2d 736, 739 (Miss. 1999). Failure to mitigate is an affirmative defense, and the defendant has the burden of proof. *Mason v. S. Mortg. Co.*, 828 So. 2d 735, 739 (Miss. 2002) (citing *Wall v. Swilley*, 562 So. 2d 1252, 1258 (Miss. 1990)).

    1.    *The Tarps*

Most of the testimony about Mt. Carmel's mitigation efforts focused on tarps which were installed on the roofs of the buildings. At some point during the days or weeks following the tornado, Balfour Construction installed tarps on the roof of the sanctuary, Building A. Wind blew them off relatively soon afterward, but another group of volunteers reattached them. A group of Mennonites put tarps on the roof of Education Building B, and Temple Baptist Church put tarps on the roof of Education Building C. All of these materials and services were donated to Mt. Carmel.

The evidence indicates that Mt. Carmel never replaced the initial tarps. Rather, they attempted to reattach them when necessary. Seaway's expert, McColl, testified that tarps of this sort will only last "three to four months, depending on the

environmental conditioning," but that they are generally effective during that time. According to testimony from GuideOne's expert, Stockdale, the tarps were still on the roofs on March 29, 2013, approximately six to seven weeks after the tornado. GC3's photographs confirm this testimony. However, the tarps had deteriorated by the time GuideOne's expert, Landry, inspected the premises on January 16, 2014. Landry testified that tarps had been installed, but that they had not been maintained.

The evidence indicates that the tarps' deterioration made an overwhelming difference in the condition of the property. Photographs taken during GC3's inspection – only six to seven weeks after the tornado, when the tarps were still installed – showed substantially less damage than photographs taken during McColl's inspection – sixteen to seventeen months after the tornado, when the tarps had been gone for some time. McColl described the water damage he observed: "Massive water damage, buckled floors, ceilings on the floor. Extremely dark. Covered with mold, both – to use a lay term, black mold, fuzzy mold. It is not a – it was a hostile inside environment." He also confirmed that water damage in the basement of the education building was caused by water intrusion after the tornado. Finally, he testified that it was raining during his inspection, and that he observed rain falling inside the building.

Reverend Fairley, the church's senior minister, could not tell the Court how long the tarps remained on the buildings, but he confirmed that when the tarps were gone, the level of water intrusion increased. At one point, Fairley testified that Mt. Carmel was "still covering roofs on the sanctuary right now," and that "people just went up and re-covered it." But then he immediately contradicted himself and stated that "[l]ast

summer, . . . during 2014, was really the last major effort we could do to the tarps." Regardless, his testimony that the church was "still covering roofs" is contradicted by the experts' testimony, reports, and photographs – as well as the Court's own viewing of the property.[59] Indeed, GuideOne's expert, Stockdale, testified: "[I]t seemed evident to me that the protection that was placed on the building was not maintained. I'm referring to the tarps on the roof." In Stockdale's opinion, the contrast between the photographs taken during GC3's inspection and McColl's inspection demonstrate that "very little was done to maintain the roof protection." He further testified that the failure to maintain the tarps was "responsible for a lot of the extensive damage that has been viewed by the Mount Carmel and Seaway experts to the structure below and the finishes . . . ."

In the end, the Court concludes that Mt. Carmel's failure to maintain tarps on the roofs of the buildings significantly contributed to the damages observed by its own and Seaway's expert. As noted above, Landry and McColl admitted that their estimates included damage caused by water intrusion during the months after the tornado. The disparity in the photographs taken by GC3's team six to seven weeks after the tornado and those taken by McColl sixteen to seventeen months after the tornado demonstrates

---

[59]On the third day of trial, the Court *sua sponte* decided to personally view the subject buildings, which are only several blocks from the courthouse. The undersigned judge, the court reporter, the Court's clerk, and the Court's law clerk visited the buildings. The Court required at least one attorney from each party to accompany it, but it did not require the attorneys to enter the most damaged sections of the buildings. No argument was made by the attorneys. No questions were asked or answered, beyond basic directions around the premises. No party objected to the Court's viewing or the procedure employed.

the extent of the damage caused by Mt. Carmel's failure to maintain tarps on the roofs. In the Court's opinion, the most credible, simplest explanation for this disparity is that provided by Stockdale: that Mt. Carmel's failure to maintain the tarps was "responsible for a lot of the extensive damage that has been viewed by the Mount Carmel and Seaway experts to the structure below and the finishes . . . ."

As for the feasibility of maintaining tarps on the roofs, it is undisputed that the sanctuary's roof is high, and that its slope is very steep. McColl testified that a rope and harness team would be necessary, and Reverend Fairley testified that church members were hesitant to get on the roof because of its height and/or pitch. Fairley also testified that one of the education buildings had a slate roof which was slippery. Stockdale admitted that there were approximately 60,000 square feet of roof across all three buildings – almost an acre and a half. He also admitted that the sanctuary's roof had a steep pitch, that it was very high, and that one would require expertise and equipment to maintain the tarps on the sanctuary.

Nevertheless, Stockdale testified that maintaining tarps on the roofs was "very feasible." Only the initial installation of tarps on the sanctuary was performed by professionals. Although the testimony is unclear as to who reattached the sanctuary tarps after they blew off, amateur volunteers installed the tarps on the education buildings. The Court further notes that Reverend Fairley testified that Mt. Carmel members reattached and/or made adjustments to the tarps at various times during their lifespan. Conspicuously absent from Fairley's testimony, however, was any indication that the church sought an estimate for professional installation of tarps,

rental of equipment to do so, or the purchase of materials. Rather, Mt. Carmel appears to have relied on the initial donations of materials and labor, without any attempt to replace the tarps once they deteriorated.

2.    *Mt. Carmel's Financial Situation*

Mt. Carmel contends that maintaining tarps on the roofs was not feasible because it did not have sufficient funds to do so. It is undisputed that GuideOne did not advance any funds to Mt. Carmel for mitigation of damages. However, it is also undisputed that the church received a lot of volunteer labor after the tornado. All the initial tarps on the roofs were donated and installed free of charge. Fairley testified that the immediate clean-up on Buildings B and C was done by volunteers from around the community, and that some of the clean-up on Building A was done by volunteers. The church did not pay any of these workers. In fact, Reverend Fairley could not identify any specific expenditures on clean-up or mitigation, beyond providing meals for volunteers.

As for the church's financial situation, the testimony was vague, at best, and inconsistent, at worst. Fairley initially testified that the church paid Balfour Construction to put tarps on the sanctuary's roof, but he could not provide any details of the alleged transaction. He later contradicted his own testimony and confirmed that Balfour donated the materials and labor. Similarly, he testified that Mt. Carmel was "still covering roofs on the sanctuary right now," and he immediately contradicted himself and confirmed that the church had ceased any attempts at mitigation.

Anthony Harris, Mt. Carmel's Chairman of the Board of Deacons, testified that

35

the church's tithes and offerings declined after the tornado, but he could not provide any specific figures. In fact, although he is the Chairman of the Deacons, Mr. Harris could not tell the Court the church's past or current monthly budget.

It appears to be undisputed that the church's membership declined after the tornado, and that it had been declining prior to the tornado. Fairley testified that he believed the church's budget was somewhere between $30,000 to $40,000 a month before the tornado, but he provided no figure for after the tornado. Both Harris and Fairley testified that the church's day care center and school generated income before the tornado, but the church's financial statements indicate that the school operated at a net loss. Reverend Fairley testified that income from another category on the financial statement had been directed to the school, but when asked specific questions about the source of that alleged income and the end to which it was directed, he was unable to provide any answers. Fairley also testified that the church employed a third-party accountant to manage its finances, but Mt. Carmel failed to present any testimony or records from the accountant to bolster its financial evidence.

Mt. Carmel has not made a mortgage payment since January 2013. Under its forbearance agreement with Seaway, Mt. Carmel would have been required to make payments of $12,500.00 in February, March, and April 2013. It is uncertain what their mortgage payment would have been after April 2013, but prior to its most recent default, the church paid Seaway $10,000.00 a month. The Court further notes that Mt. Carmel has not paid for property insurance since GuideOne attempted to cancel the Policy in the fall of 2012.

36

### 3.   Other Mitigation Efforts

After the tornado, Mt. Carmel removed wet and damaged personal property from the buildings after the tornado, cleared debris from inside and outside the buildings, pulled up wet carpet, mopped up water inside the buildings, and attempted to dry out some of the furniture and other personal property. According to Reverend Fairley, the immediate post-tornado clean-up lasted five to six weeks. He later testified that volunteers worked at the church for months. The church tried to fight off mildew and mold by cleaning with bleach, but Reverend Fairley testified that "it just got to the point where we just couldn't do that anymore, so we just shut certain sections of the buildings off." Therefore, at some point between the tornado and the trial, Mt. Carmel closed off Building B and ceased all mitigation efforts.

### 4.   Conclusions Re: Mt. Carmel's Mitigation

It is undisputed that Mt. Carmel took initial steps to mitigate its damages. The church cleared debris from the buildings, attempted to salvage personal property, and mopped up water. It accepted donated labor and materials to put tarps over the roofs, and as time went on, the church tried to fight off mold and mildew by cleaning with bleach. However, at some point after these initial mitigation efforts, Mt. Carmel stopped mitigating its damages. The church did not maintain tarps on the roofs. It closed off the most damaged portions of the education buildings, and it stopped trying to prevent mold and mildew growth. The disparity among the experts' photographs and damage estimates demonstrates that the church's cessation of mitigation efforts caused the buildings to suffer more damage than they would have otherwise.

Mt. Carmel contends that it did not have enough money to mitigate its damages, but the evidence of the church's financial situation is so vague that the Court does not find it credible. Candidly, the Court is not inclined to credit the conclusory testimony from Reverend Fairley and Mr. Harris about the church's financial situation, as neither witness was able to provide specific answers to questions regarding the church's income and expenditures before or after the tornado. Although Reverend Fairley testified that a third party accountant managed the church's finances, Mt. Carmel did not call the accountant as a witness. The Court assumes that the Church maintained bank accounts, but Mt. Carmel failed to present any account statements. Likewise, the church failed to provide copies of its tax returns or supporting documentation.[60] These are documents that would have been retained by a third party and, therefore, not lost or destroyed in the tornado.

In conclusion, the Court finds that Mt. Carmel failed to mitigate its damages, and that this failure caused it to sustain greater damages than it would have otherwise. At a minimum, it would have been feasible for the church to maintain tarps on the roofs and continue to treat mold and mildew with bleach. Ultimately, the church's failure to mitigate its damages is irrelevant to the Court's decision insofar as

---

[60]Exhibit P-24 contains some of Reverend Fairley's personal tax returns and some random Mt. Carmel financial statements from as late as July 2011 and as early as 1999. These scattered documents provide little to no support for Mt. Carmel's argument that it was not financially able to mitigate its damages. The church provided no constructive testimony explaining, interpreting, or summarizing these documents, and the Court declines to engage in amateur forensic accounting.

the policy requires GuideOne to pay the "amount it would cost to repair or replace"[61] the "direct physical loss of or damage to" Mt. Carmel's Buildings A, B, and C caused by the tornado,[62] rather than damage caused by subsequent water intrusion. As explained above, the Court has determined that Stockdale's testimony and report provide the closest estimate to that figure, and he inspected the buildings before Mt. Carmel ceased mitigating its damages.

     5.    *Seaway's Duty to Mitigate*

The policy contains no provision requiring Seaway, Mt. Carmel's mortgagee, to mitigate the damages to the property. GuideOne argues that Seaway had a common-law duty to mitigate its damages, but it has cited no Mississippi case law imposing a duty to mitigate on a mortgagee who is not in possession of the collateral property. The Mississippi Supreme Court has held that the equitable defense of "impairment of collateral" imposed no "duty upon the mortgagee, in a mortgage covering real estate collateral, who is not even in possession of the real estate, to look after, care for, maintain and upkeep same." *West Point Corp. v. New N. Miss. Fed. Sav. & Loan Ass'n*, 506 So. 2d 241, 244 (Miss. 1986). The *West Point* case is not precisely on-point with this one, but the general principles expressed in it are applicable here. Seaway was not in possession of the property, and it was not obligated to exercise its right to foreclose on the property. *See id.* at 242-43 (mortgagee may pursue remedy at law or equitable

---

    [61]*Id.* at 59.

    [62]*Id.* at 33.

remedy of foreclosure, as he deems advantageous to himself); *Fleisher v. S. AgCredit, FLCA*, 108 So. 3d 948, 954 (Miss. Ct. App. 2012). That being the case, it had no duty to maintain the property. *West Point*, 506 So. 2d at 244.

### D.    *Prejudgment Interest*

"State law governs the award of prejudgment interest in diversity cases." *Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 172 (5th Cir. 2010). "An award of prejudgment interest rests in the discretion of the awarding judge. Under Mississippi law, prejudgment interest may be allowed in cases where the amount due is liquidated when the claim is originally made or where the denial of a claim is frivolous or in bad faith." *Hans Constr. Co. v. Drummond*, 653 So. 2d 253, 264 (Miss. 1995); *see also Liberty Mut. Fire Ins. Co. v. Canal Ins. Co.*, 177 F.3d 326, 339 (5th Cir. 1999). "No award of prejudgment interest is allowed where the principle amount has not been fixed prior to judgment." *Preferred Risk Mut. Ins. Co. v. Johnson*, 730 So. 2d 574, 577 (Miss. 1998). "Prejudgment interest has been denied where there is a bona fide dispute as to the amount of damages as well as the responsibility for the liability therefor." *Upchurch Plumbing, Inc. v. Greenwood Utils. Comm'n*, 964 So. 2d 1100, 1116 (Miss. 2007). An award of prejudgment interest would be inappropriate here because the amount due on Plaintiff's claim was not liquidated until the entry of this opinion, and the Court previously determined[63] that GuideOne did not deny the claim in bad faith.

### E.    *Postjudgment Interest*

---

[63]*GuideOne*, 2015 U.S. Dist. LEXIS 912 at *15-*16; *GuideOne*, 2015 U.S. Dist. LEXIS 42681 at *5.

"Federal law governs postjudgment interest in federal cases, including diversity cases." *Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*, 718 F.3d 448, 456 (5th Cir. 2013). "Postjudgment interest is not discretionary but 'shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield.'" *Id.* (quoting 28 U.S.C. § 1961(a)). Therefore, the Court awards Mt. Carmel and Seaway postjudgment interest as provided by 28 U.S.C. § 1961.

## IV. CONCLUSION

For the reasons provided above, the Court finds that Counter-Defendant GuideOne Elite Insurance Company is required to pay Counter-Claimants Mt. Carmel Ministries, Alpha Christian School, and Seaway Bank and Trust Company $1,693,035.31 in benefits under the subject insurance policy. The Court awards postjudgment interest in the amount provided by 28 U.S.C. § 1961, and it will enter a Final Judgment consistent with this opinion.

SO ORDERED AND ADJUDGED this 3rd day of December, 2015.

s/Keith Starrett
UNITED STATES DISTRICT JUDGE